UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

OJINIKA IKEDILO, M.D.,                                                    Index No.:

                  Plaintiff,                                    COMPLAINT

       -against-
                                                                         JURY TRIAL DEMANDED
MINDY STATTER, M.D.,
JODY KABAN, M.D.,
SCOTT MELVIN, M.D., and
MONTEFIORE MEDICAL CENTER,

              Defendants
-------------------------------------------------------x

      Plaintiff, Ojinika Ikedilo, M.D., complaining of the Defendants, Mindy Statter, M.D.,

Jody Kaban, M.D., Scott Melvin, M.D., and Montefiore Medical Center, alleges as follows:

## JURISDICTION AND VENUE

      1.     This action is brought in this Court pursuant to the Civil Rights Act of 1866, 42

U.S.C. § 1981, as amended, which prohibits race discrimination in the making and enforcement

of contracts; Title VI, 42 U.S.C. § 2000d et seq., which prohibits discrimination by an

educational institution on the basis of race, color, and national origin in educational programs

receiving federal financial assistance; as well as under Section 504 of the Rehabilitation Act

which forbids discrimination based on disability by educational institutions receiving federal

assistance, and Title IX of the Education Amendments of 1972, as amended, 20 U.S.C., § 1681,

which forbids pregnancy discrimination by an educational institution receiving federal financial

assistance.

      2     Jurisdiction is specifically conferred upon the United States District Court by the

aforementioned Statutes, as well as 28 U. S. C. §§ 1331, 1343. The Court has pendent

jurisdiction over related claims brought under  New York State and New York City Laws

prohibiting discrimination on the basis of race, national origin and disability, pregnancy,

retaliation as well as her common law claims for breach of contract and misrepresentation.

3.      Venue is proper in the Southern District of New York because the events

complained of herein occurred in the County of New York, which is in the Southern District of

New York.

## PARTIES

4.      At all times relevant and material to this case, Plaintiff was a Surgical Resident at

Defendant Montefiore Medical Center (hereinafter also referred to as "MMC").

5.      At all times relevant and material to this case, Defendant Mindy Statter, M.D.,

was the Program Director in charge of Montefiore Medical Center's Residency Program where

Plaintiff was a Resident and whose actions and inactions Plaintiff complains of herein, and was

an agent/employee of Defendant Montefiore Medical Center.

6.      At all times relevant and material to this case, Defendant Jody Kaban, M.D., was

the Assistant Program Director in charge of Montefiore Medical Center's Residency Program

where Plaintiff was a Resident and who acted together and in concert with Defendant Mindy

Statter to deny Plaintiff her constitutional and statutory rights.

7.      At all times relevant and material to this case, Defendant Scott Melvin, M.D., was

part of the House Committee responsible for the Residency Program and advancement of

residents and his actions in concert with Dr. Statter and Dr. Koban, including his actual

intentional misrepresentation that Plaintiff did not Present him documents to sign for cases she

2

performed with him which she did, led to and/or caused Plaintiff's injuries.

8.    At all times relevant and material to this case, Defendant Montefiore Medical Center (MMC) was, and upon information and belief, still is a corporation organized and existing under the laws of the State of New York, and was and upon information, still is the employer of Defendants Mindy Statter, Jody Kaban and Scott Melvin whose actions Plaintiff complains of herein.

9.    Upon information and belief, MMC is an educational institution that receives federal financial assistance and is therefore prohibited from engaging in discrimination or retaliation under both Title VI and the Rehabilitation Act.

## NATURE OF ACTION

10.    This is an action to redress discrimination on the basis of pregnancy, disability, race and national origin, for an educational institution receiving federal financial assistance, and for retaliation for seeking to be accommodated on the basis of disability, in violation of Federal, State and City laws. This is also an action for breach of contract and misrepresentation.

## FACTUAL ALLEGATIONS

11.    Plaintiff was accepted as a PGY1 preliminary intern at MMC on July 1, 2011. Based on her excellent performance manifested in her interactions with Residents, Attendings and her ABSITE score, she was offered a categorical PYG1 position starting on July 1, 2012.

12.    There were many other preliminary interns and PGY2 Residents in the MMC surgical program seeking the same categorical position but the position was offered to Plaintiff by the then Program Director based on merits and she was not asked to repeat PGY1.

13.    During Plaintiff's PGY2 program, she received the Teacher of the Year Award at

3

Albert Einstein School of Medicine.

14.     Defendant Dr. Mindy Statter (herein after also referred to as Defendant Statter) became the Program Director towards the second half of Plaintiff's PYG2 program and Plaintiff did not interact much wither her except for occasional phone calls during consults or class meetings with her, and the milestone evaluation at the end of the year.

15.     Plaintiff's stellar performance and reputation at MMC was pierced as a result of her pregnancy during her PGY3 and a request for accommodation to avoid her developing baby from being adversely affected by radiation which was not well received by Defendants.

16.     Plaintiff became pregnant during her PGY3 after two prior miscarriages and during her first trimester, while in Vascular Surgery rotation at Weiler, she was asked to perform procedures involving radiation and she requested to do them at another time in light of the stage of her pregnancy and possible side effects of radiation at such early developmental stage of the pregnancy as her OBYGN had advised her doing those procedures.

17.     The procedures Plaintiff requested that others perform were minor procedures and Residents could share the work and these were procedures that PGY2 Residents could perform. The Chief Resident had some discretion as to how the work should be shared and who had to perform which specific procedures with Residents in PGY2.  Because Plaintiff requested that she should not be conducting these minor procedures that involved radiation, she was not liked during that month.

18.     In spite of the difficulties and change in attitude Plaintiff encountered as a result of asking for accommodation because of her disability/pregnancy, she persevered  and successfully completed the PGY3 as her evaluations attested to.

19.     Plaintiff's pregnancy was unfortunately a very difficult one which required, among other things, bed rest and placement of cerclage at 23 weeks, preeclampsia towards the end and induced labor. In spite of these difficulties, Plaintiff worked and operated until the day she was admitted and induced for high blood pressure.

20.     Plaintiff's real and only exposure to Dr. Statter was during May-June 2014 when Plaintiff functioned as the Pediatric Surgery Chief Resident for the month. During the very first day of the Rotation, Dr. Statter sat Plaintiff down as well as the Intern S. T. and PA Intern D. S. and gave them instructions and directions as how to operate during the month.

21.     Dr. Statter specifically told Plaintiff that she "cannot make any decisions during this rotation without clearing it with an Attending or Bob, the Department's long time PA, if the Attending is not available".

22.     Upon information and belief, Dr. Statter had not limited other Chief Residents like Plaintiff before this occasion but limited Plaintiff because of her race, national origin as well as her pregnancy related disability.

23.     Plaintiff was the only black PGY3 Resident at the relevant time and upon information and belief, very few blacks were admitted into the program during Dr. Statter's tenure as the Director of the Program and even the handful admitted or who were in the program, including two Nigerians were treated less favorably than others who were not black or Nigerians.

24.     Although Dr. Statter specifically directed Plaintiff not to take any initiatives during the month when she was the Chief Resident in Pediatric Surgery, at the end of the rotation, for following her express instructions and directions, Dr. Statter wrote that Plaintiff was "passive during the rotation waiting for people to tell her what to do".

25.     Plaintiff used her elective month to perform colonoscopies and endoscopies which

were also requirements for graduation. When trying to log her cases, Plaintiff realized that a

graduating chief resident had stolen her cases by logging surgeries that Plaintiff had performed as

his own. When this person refused to delete them, Plaintiff brought the academic fraud to the

attention of Dr. Statter but her response was that if Plaintiff had logged her cases timely, this

Resident would not have stolen them.

26.     Instead of correcting this academic fraud and laying blame where it was due, Dr.

Statter blamed Plaintiff, allowed this man who committed academic fraud to graduate and again

treated Plaintiff in a discriminatory and retaliatory manner because of her race, national origin,

sex, pregnancy related disability and because she had sought accommodation to deal with her

pregnancy disability.

27.     Plaintiff delivered her daughter on June 20, 2014 and returned to work on July 14,

2014 as PGY4 Resident. Plaintiff was made the Chief Resident in each rotation she was assigned

to. Despite the fact that PGY4 was rigorous, Plaintiff performed more surgical cases than she did

the previous year in an attempt to catch up with cases she missed when she was pregnant and

during her brief maternity leave and spent more time in the operating room and went home late

most days.

28.     Coming back as a PGY4 Resident after her pregnancy and maternity leave,

Plaintiff realized that the demeanor of many of the surgeons had changed negatively towards her

and later found out that it was as a direct result of Dr. Statter's machinations and pressure to Staff

to ensure that Plaintiff did not successfully graduate from the Program.

29.     In Plaintiff's PGY4, Dr. Statter started preemptively communicating with

6

Attendings before Plaintiff's rotation with each of them, poisoning their minds against her, and directing that Plaintiff be singled out, monitored and scrutinized more closely for medical errors, patient complaints, etc., during the rotation. In spite of Dr. Statter's direction, Plaintiff still worked as Chief Resident on most of her rotations.

30.     Dr. Smith informed Plaintiff in December 2014 that Dr. Statter had instructed him to monitor Plaintiff closely and give her feedback. Plaintiff then asked Dr. Smith to give her his own feedback on her performance and he advised her that she was doing OK and told her that she needed to improve her laparoscopic skills by doing more cases and going to Mimis Lab.

31.     Plaintiff did not meet with Dr. Statter in December 2014. Dr. Statter's discrimination and retaliation against Plaintiff manifested itself in other ways and became more obvious when Dr. Statter started taking the sides of other Residents no matter what the situation or circumstances were and even when Plaintiff had manifestly not done anything wrong.

32.     For example,  A. C. overslept and did not show up on time to cover Plaintiff in the Trauma Unit so that Plaintiff would attend Dr. Statter's PGY4 monthly meeting. Dr. Statter yelled at Plaintiff even after she explained the situation. Dr. Statter told A.C. to "babysit Plaintiff next time". Upon information, A.C., was not counseled or reprimanded in anyway but Plaintiff was blamed and yelled at for A.C.'s failure to get up on time and relieve Plaintiff to attend the meeting with Dr. Statter. During this same meeting, Dr. Statter made negative comments about Plaintiff to the whole class, telling them, among other things, that Plaintiff was unorganized.

33.     In another incident, A.S. took care of a patient and had been seeing this patient for three days before the patient's demise. During a  meeting when A.S. was called upon to make a presentation on the patient by Dr. Statter, she refused stating that Plaintiff was the first person to

see the patient. There was no consequence, criticism or negative out come for A.S. for this refusal. For Plaintiff, Dr. Statter would not even allow Plaintiff to explain why she believed that it would not be appropriate for her to make the presentation and told Plaintiff that if she did not immediately start the presentation on this patient, she (Statter) would include it in Plaintiff's file as "failure of clinical competence".

34.    There was no consequence for A. S. for failing to make the presentation when called upon even though she was the person who had been seeing and treating this patient for the prior three days but it was a career ending event for Plaintiff for even asking for an opportunity to explain why it would not be appropriate for her to give the presentation.

35.    Another instance of discriminatory treatment and retaliation was when Plaintiff missed a clinical lab because she was covering Trauma at Jacobi Hospital and there was a Level 1 Case that was extremely critical and had to go emergently to the operating room. Although Plaintiff emailed Dr. Statter and explained the circumstances and why Plaintiff missed the clinical session, Dr. Statter emailed Plaintiff that she (Statter) would again document this incident in her file as failure of clinical competence for the discussion of the Academic Committee.

36.    There were many other instances of Dr. Statter picking on Plaintiff and treating her differently than she treated others too numerous to recount in a Complaint and all these actions subjected Plaintiff to a hostile work environment based on race, national, origin and pregnancy/disability.

37.    Plaintiff was offered her PGY5 contract for the July 2015-2016 academic year in February 2015 and she signed it and returned it to the Department.

8

38.     ABSITE results for PGY4 year came out in March 2015. Most of the residents performed poorly on it and Dr. Statter was not happy about it and asked that Residents do more practice questions to get more proficient. There was no set percentile goal at this time.

39.     At the beginning of March 2015, Plaintiff emailed Dr. Statter and the Jacobi Trauma/Critical Care team requesting a letter of recommendation to apply for Trauma/Critical Care Fellowship. Dr. Teperman replied that an issue had come up which he needed to clear up.

40.     Upon information and belief, after Plaintiff had requested a letter of recommendation to enable her pursue her fellowship, Dr. Statter emailed the Surgical Attending Staff requesting a composite evaluation of Plaintiff and also advised them that Plaintiff would be discussed at the next House Staff meeting. Dr. Statter also asked if Plaintiff would repeat her PGY4. The Letter of Recommendation was never provided to Plaintiff.

41.     Another Nigerian Resident had requested a letter of recommendation after a rotation in Vascular Surgery in order to pursue a fellowship. Dr. Statter asked the Chief of Vascular Surgery not to provide the letter to the Nigerian alleging that an incident occurred during the rotation. Dr. Statter, upon information and belief, planned to derail the progress and graduation of this Nigerian as she did against Plaintiff. However, because the Chief of Vascular Surgery ignored her request and gave the letter of recommendation this Nigerian did the Fellowship and eventually graduated because the Chief would not succumb to Dr. Statter's discriminatory treatment of this Nigerian.

42.     Dr. Statter also demanded that another Nigerian who had very good ABSITE scores but received bad evaluations in a couple of rotations repeat the whole year instead of those rotations where he received the bad evaluations unlike the treatment meted out to non-blacks

and/or non-Nigerians.

43.    The alleged reason why Dr. Statter wanted Plaintiff to repeat the year was her

below the 30th percentile in ABSITE score which was an internal examination. ACGME Rules

specifically stated that Residents should not be held back because of low ABSITE scores and

individuals who scored below the 30th percentile were promoted and allowed to graduate while

Plaintiff was not and was the only person who was so treated.

44.    Dr. Teperman openly expressed his concerns about the desire of Dr. Statter to

hold Plaintiff back for one year when no one else had ever been held back in the history of the

program's 10 years because of alleged low ABSITE score.

45.    Defendant Dr Kaban who was the Assistant Program Director and who worked

together and in concert with Dr. Statter to discriminate and retaliate against Plaintiff based on

protected characteristics and who had in fact never worked with Plaintiff and had not been

familiar with her work or competency insisted that Plaintiff should repeat PGY4.

46.    Dr. Kaban is a thoracic surgeon and Plaintiff never did a rotation with her during

her Trauma rotation although she occasionally took trauma calls and Plaintiff never operated

with Dr. Kaban.

47.    The Trauma composite evaluation was submitted on March 21, 2015, and those

that evaluated Plaintiff included general surgery and vascular surgery Attendings that Plaintiff

never worked with while doing her trauma rotation and who were not in a position to evaluate

her if Defendants wanted a fair process and if the real purpose was to actually ascertain

Plaintiff's competence.

48.    At the time Dr. Statter requested a composite evaluation of Plaintiff, to the best of

Plaintiff's knowledge, Plaintiff had not made any medical or surgical errors, no patient or

relatives of a patient had complained about Plaintiff as a person or a surgeon and, in spite of the

direction by Dr. Statter that Plaintiff should be closely monitored and reported upon, the

evaluation of the Attendings that actually worked with Plaintiff had been satisfactory except for

Dr. Smith who had also given other Residents bad evaluations.

49.    Upon information and belief, there was no other person who was subjected to the

same type of treatment as Plaintiff and as Dr. Teperman stated, no one else had been held back in

the history of the program under the circumstances in which Plaintiff was held back.

50.    Plaintiff believes that she was held back because of her race, national origin,

pregnancy and accommodations she needed because of the difficult pregnancy and child birth.

51.    When Plaintiff applied for the Residency Program at MMC and started it, there

was no requirement that an individual must attain a particular ABSITE score in order to be

promoted to the next class and Plaintiff started the program knowing and believing that if she

successfully completed her rotations and did not place patients at risk and got satisfactory

evaluations, she would be promoted.

52.    The ACGME Rules governing the promotion of Residents specifically forbade

holding back Residents because of low ABSITE scores. Changing the requirements in Plaintiff's

fourth year was a breach of both an express and implied contract that if Plaintiff upheld her part

of the bargain, Defendants would also uphold their part of the bargain, and also amounted to a

misrepresentation by Defendants.

53.    On March 26, 2015, Dr. Statter emailed Plaintiff and requested that she meet with

her and Dr. Stone in Dr. Stone's Office. Dr. Stone was Plaintiff's Mentor. When Plaintiff

inquired from Dr. Stone what the meeting was about, he advised that he did not know but thought it had to do with her evaluation. Plaintiff them looked at New Innovation and realized that Dr. Smith and the Trauma Team had written bad evaluations about her. Dr. Smith's colleague in acute care who also gave her an evaluation for the same rotation gave a completely different evaluation as contrasted with Dr. Smith's negative evaluation.

54.    The Trauma evaluation stated that it was a consensus but included six non-trauma surgeons that Plaintiff did not work with during her evaluation. Plaintiff was disappointed and shocked by this evaluation as she did not make any decisions that the Trauma team found faulty or place patients at risk and also took good care of her patients. There was no patient care issue during her rotation and she could not understand this evaluation even when Residents with patient care issues did not get such bad evaluations.

55.    Plaintiff's interest had been in trauma surgery and she focused on it and even did an additional month in the rotation because of that interest and could not understand any logical basis for the evaluation other than the predetermined result that Dr. Statter wanted and asked for even before Plaintiff started that rotation.

56.    During the meeting with Dr. Stone on March 15, 2015, Dr. Statter told Plaintiff that she had to repeat the year and all Plaintiff's pleas about her situation, her difficult pregnancy and new child made it difficult for Plaintiff to study for the ABSITE test fell on deaf ears. Plaintiff also told Dr. Statter that it was unfair to single her out when others scored less than the 30th percentile which she had demanded and no one else was being held back. Plaintiff also pointed out that because of her role as Chief Resident, more slack as had been given in the past because of the responsibilities of that role.

12

57.    Plaintiff also pointed out that she only received bad evaluations in 2 out of 12 rotations and should not be made to repeat the whole year and that Dr. Smith gave bad evaluations to others in the rotation and no one was being made to repeat but Dr. Statter and Dr. Kaban insisted that Plaintiff must repeat PGY4. Plaintiff could easily have repeated the 2 rotations in which she received bad evaluations if Defendants were motivated by academic needs of Plaintiff and not discrimination or retaliation.

58.    During the month of March Plaintiff started a minimally invasive rotation with Dr. Camancho and when she arrived on the first day with her Junior Resident A. L.,  after doing their rounds at 6:45 a.m., Dr. Camancho had not yet arrived for the 7:30 scheduled cases and because they had a full day ahead, they decided to grab breakfast while they waited and returned by 7:14 a.m. and were berated and yelled at and sent home for that day.

59.    This first day's interaction and reaction to Plaintiff was because of Dr. Statter's direction that Plaintiff be singled out and monitored in a special way. Dr. Camancho tried to find fault in everything Plaintiff did during that rotation, and Plaintiff had to get documentation and nursing notes to support her position and protect herself against unfounded accusations.

60.    Dr. Camancho would ask questions during the rounds and in the operating room to test Plaintiff's knowledge. At the end of the rotation Dr. Camamcho told Plaintiff that he had been directed to monitor Plaintiff and more strictly supervise her because she was refusing to repeat the year and that after working with Plaintiff for the rotation, he found her performance to be satisfactory. He further told Plaintiff that he was not a member of the decision committee and therefore that his decision may not make any difference but that he would complete his evaluation anyway.

61.     During this month, Plaintiff did not have any negative encounter with Dr. Moran or Dr. Choi. Plaintiff knew that both were part of the Committees (Educational and House Staff Committees) and approached Dr. Choi to ask her opinion regarding Dr. Statter's insistence that Plaintiff repeat PGY4. Dr. Choi informed Plaintiff that Dr. Statter was very upset with Plaintiff and told them during the meetings that Plaintiff had not done cases she (Statter) had directed Plaintiff to do.

61.     Dr. Choi advised Plaintiff to call Dr. Statter and beg her once she calmed down and inform her (Statter) that it was unfair to ask Plaintiff to repeat the entire year. She further added: "We are tired of hearing about this in our meetings, just talk to her." Plaintiff took Dr. Choi's advise and called Dr. Statter but she refused to budge on her demand that Plaintiff repeat PGY4.

62.     On May 1, 2015, Dr. Statter had emailed Plaintiff advising her that the Committee stated that they did not have enough evidence to make a decision on whether Plaintiff should repeat PGY4 or not, and had requested that Plaintiff perform 6 cases and submit preop worksheets, operative assessment forms as well as clinic and Cameo forms. She asked that Plaintiff submit them by May 13, 2015.

63.     Although Dr. Statter was the Program Director and was the cat's paw orchestrating the move to make Plaintiff repeat PGY4, after the Committee's decision, it is only the decision on the appeal that follows (if Plaintiff decides to appeal) that decides whether Plaintiff should repeat the year or not and is the final determinative act as to whether Dr. Statter's desire would be carried out - whether Plaintiff repeated the year or not as the Board during the appeal can uphold the decision of the Committee, reject it totally, or modify it.

14

64.    Dr. Statter mentioned a few surgeons' names and stated that they were aware of this requirement that Plaintiff perform 6 cases and submit the required information on them but she further advised Plaintiff to perform those cases with Dr. Etkin Moran.

65.    Plaintiff took the advise of Dr. Statter and performed all the cases that Dr. Moran had on schedule during that period and also performed additional surgeries with other surgeons and submitted the required information with regards to the surgeries with Dr. Moran as well as the additional surgeries.

66.    Although Plaintiff took Dr. Statter's specific direction to do the cases with Dr. Moran, after Plaintiff finished the cases, because Dr. Statter did not get the result that furthered her goal that Plaintiff must repeat PGY4 (although Dr. Moran gave her a bad evaluation, the other doctor that performed the cases with Dr. Moran gave her a very good evaluation thereby canceling out Dr. Moran's bad evaluation), she turned around and told the House Staff Committee that she (Statter) had instructed Plaintiff to do the cases with Dr. Scott Melvin and Plaintiff failed to do so.

67.    Because of Dr. Statter and Kaban's calculated and intentional actions of pressuring staff to give Plaintiff bad evaluations, to specifically monitor her and report any minor issues or mistakes and, most significantly, because of  Dr. Statter's deliberate deceit of the House Committee in telling them that Plaintiff was insubordinate in failing to follow her specific direction to do the cases with Dr. Melvin and that she did not do the cases with him, that is, that Plaintiff was intentionally insubordinate to her as the Program Director, Plaintiff received a letter in June 2015, directing that she should repeat PGY4.

68.    After misrepresenting her instruction to do the surgeries with Dr. Moran to the

15

House Committee (even though the instruction to do the surgeries with Dr. Moran was in writing from Dr. Statter to Plaintiff), Plaintiff did six additional cases with Dr. Melvin and presented the paperwork to him before each case. The feed back that Dr. Melvin gave Plaintiff after she performed the cases was that her performance was satisfactory. When Plaintiff asked that the cases she performed with Dr. Melvin be used as that was the then position of Dr. Statter that only cases performed with Dr. Melvin would satisfy her, Dr. Melvin who at this time was in league with and acting with Drs. Statter and Koban denied that Plaintiff brought the paperwork to the surgeries or presented him with the paperwork to sign off on.

69.    After receiving the letter, Plaintiff talked to Dr. Statter and Dr. Melvin and suggested that she should be allowed to move up to PGY5 while Dr. Melvin himself could monitor her as Dr. Statter had made it clear then that only his "approval" of her performance would satisfy her. Dr Melvin's response was that Plaintiff should have been terminated outright, that she should resign if she wanted and that some people don't get to finish their residencies and it was OK.

70.    Although Plaintiff decided to appeal the decision on whether to repeat PGY4 or not and was entitled to the final decision before repeating the year if it turned out unsuccessful, to frustrate the appeal process, Dr. Statter insisted that for Plaintiff to remain in the Program, she must  immediately begin repeating PGY4 and Plaintiff was forced to do so even though the appeal process had not been completed.

71.    After Plaintiff began repeating PGY4, based on how the Dr. Statter and Kaban were treating Plaintiff and wanted other Attendings to treat her, Plaintiff began being subjected to such a hostile work environment by many Attendings that her work life was intolerable and she

was subjected to such serious stress levels that she became afraid of going to work.

72.     No other Resident was subjected to such horrible work conditions as Plaintiff but Plaintiff endured and persevered, knowing the source of her travails and trying to conquer the obstacles that Drs. Statter, Kaban and Melvin had put in her way because she dared to get pregnant during the program and asked for work that would not endanger her baby, took time off because of complications and because of her race and national origin.

73.     The conditions to which Plaintiff was subjected to, included, but were not limited to: (i), being yelled at openly and in the presence of workers and patients by Dr. Porreca who told Plaintiff that she was clumsy but admitted that he knew that he was giving Plaintiff a hard time but however expected Plaintiff to try and impress him especially in light of what Plaintiff was then going through; (ii), Not interacting or speaking to Plaintiff throughout the rotation and giving Plaintiff a bad evaluation at the end as happened with Vascular Services at Moses.

74.     Although some surgeons subjected Plaintiff to severe hardship to be in the good books or continue in the good books of the Program Director and her Associate, Plaintiff persevered despite the very difficult situation she found herself in and still performed her duties as the Chief Resident, worked harder and asked for feedback. Most of Plaintiff's rotations gave her good evaluations and feedback despite the fact that they all knew what was going on.

75.     The appeal process finally took place on October 22nd, 2015 and the decision dated November 8, 2015, upheld the decision of the Department that Plaintiff should repeat PGY4. Plaintiff had already spent 5 months repeating PGY4 and once the appeal failed, she started completing the preop worksheets and operative assessment forms as instructed.

76.     In November 2015, Plaintiff met with Dr. Stone for her semi-annual review. Dr.

Stone reviewed Plaintiff's evaluations and noted that although the evaluations showed that Plaintiff had improved in various aspects, he felt that Plaintiff had performed better than average in Trauma rotation and Trauma night float rotation.

77.    Dr. Stone inquired about what happened at Moses Vascular rotation and Plaintiff advised that nothing had happened as far as she new. Dr. Stone advised Plaintiff to ask for feedback during mid-rotation to avoid surprises on her evaluation. Dr. Stone concluded by telling Plaintiff that she had met all the requirements for the half year and encouraged her to study hard for ABSITE.

78    Dr. Stone had rated Plaintiff's medical knowledge in her semi-annual evaluation to be "met requirement".  In December 2015, Dr. Stone informed Plaintiff that Dr. Statter had changed Plaintiff's medical knowledge to "requires attention".

79.    Upon information and belief, Program Directors were not and are not supposed to falsify and/or forge academic records and Plaintiff is unaware of any other case where it had happened. Dr. Statter falsified an entry in Plaintiff's academic record because of her race and national origin and because she had complained of being singled out for different treatment and had taken opportunity of the appellate process afforded her and because she was about to move on to her final year without incidents. Changing Plaintiff's academic record to "requires attention" was the only way Dr. Statter could again try to kick Plaintiff out of the program and was the only way she was able to succeed in kicking her out of the program.

80.    Plaintiff received her PGY5 Contract in January 2016 and signed and returned it the same month.

81.    Plaintiff took the ABSITE internal test on February 2nd, 2016 and the result came

18

out in March. Plaintiff performed poorly in the ABSITE test though there were others who also performed poorly. In February, Dr. Statter emailed Plaintiff a reminder of the terms of her repeating PGY4 and that she needed to document meetings with her mentors. Plaintiff thanked Dr. Statter for the reminder and made appointment to meet with Dr. Sreeramoju despite the fact that she was on vacation. Plaintiff met with Dr. Sreeramoju in February and Dr. Smith in March.

82.     Dr. Smith told Plaintiff that he (Smith) had not heard anything that would prevent Plaintiff from being promoted and that Plaintiff performed well in cases she did with him. He completed Plaintiff's preop worksheets and operative assessment forms. Plaintiff gave Dr. Smith the worksheets and operative assessment forms completed by other surgeons and he reviewed them and returned them to Plaintiff.

83.     Plaintiff found out that she was pregnant in February 2016 and in March 2016 informed some Attendings and Residents and sought an accommodation because she needed to undergo a procedure.

84.     After notifying Defendants and their agents that she was pregnant in late March 2016, Plaintiff was to meet with Dr. Scott Melvin in April, 2016, as part of her scheduled meetings with her mentors but instead received an email on April 13, 2016, asking her to meet with Dr. Statter and Dr. Melvin and was informed on April 18, 2016, that her residency would be terminated by the end of June, 2016.

85.     When Plaintiff asked why she would not be promoted and why her Residency would be ended in light of where she was at that time, Dr. Statter informed her that she did not receive an ABSITE score above 30th percentile, in addition to her un-professionalism, not communicating with her team and her technical skills.

86.    Dr. Statter stated that although Plaintiff's evaluations were good, she did not believe that they were accurate and believed that they were faulty. She also stated that she (Statter) believed that Plaintiff only met with Dr. Sreeramoju and did not complete the preop worksheets or the operative forms.

87.    Plaintiff advised Dr. Statter and Melvin that she had met Dr. Stone in December, was on vacation the first two weeks of January, was on night float the rest of January and therefore did not complete the preop worksheets or operative assessment forms for that month and had met with Dr. Sreeramoju in February and with Dr. Smith in March with the intention of meeting Dr. Melvin in April. Plaintiff also pointed out that many other students did particularly poorly in ABSITE test score and did not meet the 30th percentile that Dr. Statter demanded as well and that she (Plaintiff) should not be singled out as a result of it.

88.    Dr. Statter's stated reasons for terminating Plaintiff's residency were pretextual and the real reasons were discrimination and retaliation. Plaintiff received satisfactory evaluations attesting to her technical skills and communications skills, she met with some of her mentors and was going to meet with the last - Dr Melvin - when she was on the Moses Campus as instructed by Dr. Statter but Dr. Statter discounted the evaluations that supported Plaintiff's technical and communication skills as inaccurate and false because they did not advance her discriminatory purpose and also disregarded the fact that Plaintiff met with more advisors rather than only one as Dr. Statter insisted on.

89.    Some of Plaintiff's colleagues told her about how surprised they were because Plaintiff was being singled out again and treated so unfairly because of her alleged ABSITE score. Plaintiff was also told by a few Attendings that some of the Residents were caught

cheating during the ABSITE test and received no repercussion for academic dishonesty.

90.     One of the residents who was caught cheating was a white Hispanic woman but Dr. Statter allowed her to graduate and minimized her cheating in the ABSITE test.

91.     When Plaintiff pointed out how differently and worse she had been treated compared to others in similar positions, Dr. Melvin told Plaintiff that the Department was not perfect and there was lack of communication among the Attendings but that they would not change their mind.

92.     Defendants terminated Plaintiff's Residency Program and failed to promote her to PGY5 immediately upon learning that she had become pregnant because of her un-professionalism of getting pregnant again during her residency and again seeking accommodation on account of her disability/pregnancy.

93.     Defendants retaliated against Plaintiff for seeking accommodation - a few days off for preventive cerclage that required a few days off for her pregnancy. Such accommodation did not and would not have amounted to a hardship for Defendants and would not have impacted the work of MMC in any meaningful way.

94.     Drs. Melvin and Statter asked Plaintiff to resign from the program and avoid the appeal process which Plaintiff was entitled to and Plaintiff informed them that it would be unfair to ask her to resign after 5 years of rigorous surgical training only because of poor in service score which many other residents in the program also scored poorly in but were not being asked to resign.

95.     Defendants singled Plaintiff out for different terms and conditions of residency on account of her black race and Nigerian national origin. Upon information and belief, Defendant

Statter did not admit any Nigerians to the Program after she became the Program Director. Upon

information and belief, she only admitted one African American to the categorical program and a

few Blacks into preliminary positions to fill the quota.

96.     Plaintiff was subjected to different terms and the conditions of employment that

no other Resident was subjected to which included, but were not limited to the following: the

Program Director falsifying  her academic records to negatively impact her; disregarding the

evaluations of other professionals who refused to succumb to her pressure or discriminate against

Plaintiff by alleging that the evaluations they gave Plaintiff were not accurate, not reliable and

therefore invalid and would not be relied upon; telling the House Committee that Plaintiff was

insubordinate by refusing to perform cases that she was directly required to perform as part of the

evaluation into whether she should be promoted to PGY5 or not; requiring that Plaintiff attain an

ABSITE score of 30% or above when no one else was required to attain that as a condition for

promotion and when that had never been a requirement for promotion within the program or the

ACGME requirements;  and telling Attendings to single out Plaintiff to monitor, report on and

scrutinize negatively.

97.     After Defendants refused to rescind the decision, Plaintiff met many Surgical

Attendings who observed, interacted with and were familiar with Plaintiff's work during her

rotations and they strongly advised her to appeal the decision of Dr. Statter and on April 27,

2016, Plaintiff emailed Dr. Statter and advised her that she would be appealing the decision not

to promote her to PGY5.

98.     In May, 2016, Plaintiff started her Minimally Invasive rotation again with Dr.

Camancho and Dr. Moran. At this time, they both knew that Plaintiff had been terminated from

the program and also knew that she was pregnant and they were unusually nice to Plaintiff.

99.     At the end of the rotation, when Plaintiff asked for feedback, Dr. Moran told

Plaintiff that even though the service was smooth and nothing bad happened, he felt that Plaintiff

would not have done well had there been issues. He stated that he would feel skeptical taking

Plaintiff's judgment if she was the Chief Resident in-house and see a patient with a junior intern.

He then asked Plaintiff if she had anything to say and Plaintiff responded "No" to avoid him

writing that Plaintiff was confrontational during feedback. He told Plaintiff to feel free to

approach/contact him anytime if Plaintiff had any questions to ask and to email him anytime.

Plaintiff emailed Dr. Moran to ask for any specific examples of what Plaintiff had done to make

him believe that Plaintiff would not be capable of handling issues if they arose but he never

responded to that email.

100.     At the end of June, 2016, Dr. Camancho and Dr. Moran completed their

evaluations of Plaintiff and both were negative.

101.     After Plaintiff filed her appeal, she tried unsuccessfully to get it heard as early as

possible so that she would know her faith before the end of July, 2016, to avoid a lapse in her

salary, compensation and health insurance for herself and her family and Plaintiff had to cancel

medical appointments and tests because she had no medical insurance.

102.     Plaintiff applied for a surgical critical care fellowship position at Westchester

Medical Center (also referred to as "WMC"). They invited Plaintiff for an interview and later

offered Plaintiff the position after Plaintiff explained what exactly transpired in her program at

MMC and why she was terminated. She also showed them the ABSITE test result as well.

103.     Westchester Medical Center's Surgery Department informed Plaintiff that they

23

needed her summary of evaluation before she could sign her offer letter and start work. Plaintiff

notified Dr. Statter and Adrianne, the MMC Surgery Department Coordinator of the need to send

Plaintiff 's summary evaluation to WMC so that she could start her fellowship.

104.    A week later, Plaintiff was notified by WMC that Dr. Statter had not yet sent over

her summary evaluation and she sent a text to Dr. Statter again asking her to kindly send the

summary to WMC as soon as possible.

105.    Dr. Stone called Plaintiff on July 25, 2016, informing Plaintiff that Dr. Statter had

requested that Plaintiff resign from her Residency at MMC and withdraw the appeal and that if

she failed to do as Dr. Statter had demanded, that Dr. Statter would not send the Evaluation

Summary to WMC, and if she did, it would be a bad evaluation.

106.    Again on July 25, 2016, Plaintiff send a text message to Dr. Statter requesting that

she send the requested evaluation and Statter responded that she would call Plaintiff after the

clinic. Later that evening, Dr. Statter texted Plaintiff and told her that Dr. Stone would call.

107.    When Dr. Stone called, he advised Plaintiff that Dr. Statter insisted that Plaintiff

must resign from the surgery program at MMC and withdraw her appeal as a condition for

having her summary evaluations sent to WMC. Plaintiff explained that she saw no reason to

resign from a program where she had already been terminated from and also cancel the appeal

process and explained to Dr. Stone that the failure to send the summaries had already prevented

her from working for one month. Dr. Stone apologized for calling Plaintiff with that information

and stated that she would tell Dr. Statter to call Plaintiff herself.

108.    Plaintiff emailed Dr. Statter on July 27, 2016, and stated that she believed that

asking her to give up her right to appeal and to resign from the program as a condition for

24

providing her with the summaries amounted to blackmail. Plaintiff also said in the same email

that she believed that she had a right to her summary of evaluations after she had been terminated

by Dr. Statter without having to resign or withdraw her appeal.

109.    Plaintiff in response to Dr. Statter's text after her email called Dr. Statter and

while speaking to her made her aware that she was recording the phone call as what she was

doing was blackmail. She told Dr. Statter that it was unfair to terminate her residency and also

prevent her from obtaining a fellowship elsewhere and that she had been truly victimized for the

prior two years and treated unfairly.

110.    Later on July 27, 2016, Dr. Statter called Plaintiff to advise that Plaintiff would be

paid her July salary, that her benefit would be reinstated and that she would send her (Plaintiff's)

summary of evaluation to WMC.

111.    Plaintiff's Residency at MMC was terminated after five years without any factual

basis other than alleged low ABSITE score in an in-service test in which other residents in the

department performed poorly and no one else was treated as poorly as Plaintiff and Plaintiff was

treated so poorly because she got pregnant during the program and requested accommodation for

her difficult pregnancy and took time of to be with her baby. Plaintiff was also treated poorly

because she is Black and from Nigeria.

115.    Plaintiff's evaluation showed that her performance improved in every aspect in

the second PYG4 year. She completed preop worksheets, preoperative assessment forms and her

mock oral board improved.

116.    On the Mock oral, Plaintiff scored above 50% percentile of her peers from MMC,

Columbia Medical Center, Brookdale Hosptial, and Sunny Downstate that took the oral with her.

Plaintiff requested her Morbidity and Mortality (M & M) evaluations but MMC refused to release them to Plaintiff.

117.    Plaintiff's technical skills had improved as well as her patient management and Plaintiff in 2015 passed the fundamental of laparoscopic surgery exam which is the ACGME requirement for graduation. Plaintiff's case logs exceeded the ACGME requirement for graduation and Plaintiff only needed to complete her PGY5 year to be able to practice as a surgeon after training for five years as one.

118.    There was no specific ABSITE score which a Resident or Intern was required to obtain in order to be promoted to the next class when Plaintiff signed her contract and entered into the Internship and later Residency Program at MMC. The ACGME guidelines which were incorporated into and which was part of Plaintiff's contract of employment with MMC specifically forbade using low ABSITE score to prevent the promotion of a Resident. The requirement that Plaintiff must get a specific score in order to be promoted is a pretext for discrimination and retaliation as well as breach of both and express and implied contract that MMC entered with Plaintiff when she stated the program. Furthermore, individuals with low ABSITE scores other than Plaintiff had been promoted.

119.    There is evidence that people with low ABSITE scores also pass the Board. And while others who had less than the 30th percentile that Dr. Statter gave residents at the target score were promoted, Plaintiff was the only one not promoted and Plaintiff's special circumstances, including her pregnancy and disability as well as medical conditions also affected the ABSITE score Plaintiff had.

120.    Dr. Statter did not want Plaintiff to become a surgeon under any circumstances

26

because of Plaintiff's "un-professionalism" which Plaintiff believes is her code word for Plaintiff

not focusing on the residency and graduating but instead getting pregnant two times during the

residency and seeking accommodation. Dr. Statter advised Plaintiff to quit the program and get a

wound care job.

121.    Plaintiff performed 935 surgeries while at MMC. There was not a single

complaint from patients, Attendings or evaluators about the appropriateness of the actual care

that Plaintiff had provided to any of the patients in those cases.

122.    Most of Plaintiffs evaluations were satisfactory. The few unsatisfactory

evaluations were made by Assistant Program Director Dr. Kaban who did not work with Plaintiff

and others that Dr. Statter could get to work with her to carry out the discriminatory and

retaliatory actions against Plaintiff and they only began after Plaintiff became pregnant the first

time and Dr. Statter knew that Plaintiff was pregnant and after Statter had decided not to promote

Plaintiff to PGY5, and were designed to retroactively justify the decision already made.

123.    Jody Kaban who spearheaded the unsatisfactory evaluation did not work with

Plaintiff, did not evaluate her and was in no position to evaluate her but as the Assistant Program

Director working directly with Statter had to come up with evaluations which were unfavorable

and which she stated was the consensus evaluation.

124.    Defendant Statter questioned Plaintiffs satisfactory evaluations from those she

actually worked with and who were in a position to evaluate her, telling some of the evaluators

that they must have made a mistake, showing that her true motive was not actual evaluations of

Plaintiff but only tainted evaluations that justified a desired goal and that the alleged bad

evaluations/performance was therefore a pretextual reason to reach her desired discriminatory

goal.

125.    Even after telling Attendings to specifically monitor Plaintiff and look for faults

with her work, few could be found. It was known that Defendant Statter had it out for Plaintiff

and the discriminatory treatment was because of Plaintiff's race, national origin, pregnancy

and/or pregnancy related disability.

126.    Dr. Statter refused to send Plaintiff's summary to WMC after Plaintiff informed

her of her plan to return to the Program the following year after accepting the fellowship position

in the 2016/2017 academic year, allowing her time to study for USMLE step 3, and the ABSITE

so that she would return to complete the PGY5 during the 2017 academic year.

127.    Plaintiff's appeal process did not end until November, 2016, when Plaintiff was

advised that she would be reinstated into the program by July 1, 2017, provided that by March

31, 2017, she advised the Department of Surgery that she had passed the USMLE Step 3

examinations and she has taken the ABSITE examination by January 27, 2017 and achieved at

least 30th percentile score.

128.    Plaintiff was notified in November 2016 of this decision, the same month she

gave birth to her daughter and she was also diagnosed with a thyroid problem that her doctors

thought was cancerous and having very little time to study for the ABSITE with additional

compounding factors of having just given birth and going to appointments and evaluations for

what was believed to be a cancerous condition did not make for the mind-set and time line to

have a good ABSITE score with the result that Plaintiff's January 27, 2017, ABSITE score was

also poor.

129.    At the hearing on Plaintiff's Appeal, none of Plaintiff's evaluators who evaluated

her performance before her termination testified to support Dr. Statter's position and it was only those who evaluated her after her Residency had been terminated and who were in league with Dr. Statter who did. The only allegation of substance was that a patient's liver bled when Plaintiff was performing a procedure but this Attending who made this allegation against Plaintiff admitted that this same liver bled when he himself (the Attending) performed a procedure and that he had told Plaintiff that the liver was damaged and that was why it bled. Plaintiff believes that the Board found no merit whatsoever for the reasons given for the termination of Plaintiff's Residency and that was why they mandated that she should be reinstated into the Program.

130.    Plaintiff successfully completed her fellowship and is a licensed physician in the State of New York and the only thing preventing her from practicing as a surgeon is the PGY5 program.

131.    Plaintiff was unable to score up to the 30th percentile in ABSITE but had asked for another opportunity and an accommodation in light of her medical situation but Defendants have failed to give same to Plaintiff.

132.    Obtaining a particular ABSITE score had never been a requirement for completing the program before Plaintiff's pregnancy, and is not a guarantee of passing the Board as some with lower scores also pass the Board but Plaintiff believes that the Appeal Board included this requirement to throw Dr. Statter a bone instead of unconditionally overruling her and reinstating the Plaintiff without conditions.

133.    The conditions imposed on Plaintiff were imposed only on her and no other person and were imposed because of her race, national origin and pregnancy discrimination and

retaliation.

134.    Plaintiff was subjected to a hostile work environment on account of her race, national origin, pregnancies, retaliated against for seeking reasonable accommodations and terminated immediately after Defendant Statter learned that she was again pregnant when all prior evaluations and communications suggested that Plaintiff would be promoted to PGY5.

135.    The actions of the Defendants were callous, intentional, reckless and done maliciously to punish Plaintiff for her protected status and for exercising her rights and Plaintiff is therefore entitled to punitive damages against Defendants individually and as well as against MMC.

136.    Monetary damages would not be enough to make Plaintiff whole and Plaintiff demands that the Court declare that the actions of the Defendants violated Plaintiff's right and direct that they immediately admit her to PGY5 and refrain from further discriminating against and/or retaliating against Plaintiff.

137.    Because of the named Defendants discriminatory animus against Plaintiff and their actions and/or intentions to ensure that Plaintiff never graduate from the program, Plaintiff demands an Order from the Court directing that these same named individual Defendants be prevented from either directly or indirectly supervising her remaining year of Residency when she is reinstated into the program.

## AND AS FOR A FIRST CAUSE OF ACTION

138.    Plaintiff repeats and re-alleges paragraphs 1 through 137 as if each paragraph is repeated and re-alleged verbatim herein.

139.    Plaintiff was discriminated against in the terms and conditions of her Residency

Program when Defendants refused/failed to promote her to PGY 5 in 2016, in violation of the Civil Rights Act of 1866, as amended, and Title VI of the Civil Rights Act of 1964, as amended, which forbid racial discrimination in the making and enforcement of contracts and in the terms and conditions of employment.

## AND AS FOR A SECOND CAUSE OF ACTION

140.    Plaintiff repeats and re-alleges paragraphs 1 through 139 as if each paragraph is repeated and re-alleged verbatim herein.

141.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2015, in violation of the Civil Rights Act of 1866 as amended and Title VI of the Civil Rights Act of 1964, as amended, which forbid racial discrimination in the making and enforcement of contracts and in the terms and conditions of employment. Because the applicable statute of limitations is 4 years, this failure to promote is timely.

## AND AS FOR A THIRD CAUSE OF ACTION

142.    Plaintiff repeats and re-alleges paragraphs 1 through 141 as if each paragraph is repeated and re-alleged verbatim herein.

143.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendant Statter refused/failed to timely send her summary to Westchester Medical Center in July 2016, in violation of the Civil Rights Act of 1866,  as amended 42 U.S.C., section 1981, and Title VI of the Civil Rights Act of 1964, as amended, which forbid racial discrimination in the making and enforcement of contracts and in the terms and conditions of employment. Because the applicable statute of limitations is 4 years, this action is timely.

31

## AND AS FOR THE FOURTH CAUSE OF ACTION

144.    Plaintiff repeats and re-alleges paragraphs 1 through 143 as if each paragraph is repeated and re-alleged verbatim herein.

145.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016, because of her pregnancy related disability in violation of the Rehabilitation Act which forbids disability discrimination by an institution receiving federal assistance and MMC, upon information and belief, is an institution that receives such an assistance.

## AND AS FOR THE FIFTH CAUSE OF ACTION

146.    Plaintiff repeats and re-alleges paragraphs 1 through 145 as if each paragraph is repeated and re-alleged verbatim herein.

147.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016 on the basis of her pregnancy and/or pregnancy related disability in violation of Title IX which forbids pregnancy discrimination by an institution receiving federal assistance and MMC, upon information and belief, is an institution that receives such an assistance.

## AND AS FOR THE SIXTH CAUSE OF ACTION

148.    Plaintiff repeats and re-alleges paragraphs 1 through 147 as if each paragraph is repeated and re-alleged verbatim herein.

149.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016 on the basis of her sex in violation of Title IX which forbids sex discrimination by an institution receiving federal

assistance and MMC, upon information and belief, is an institution that receives such an assistance.

## AND AS FOR THE SEVENTH CAUSE OF ACTION

150.     Plaintiff repeats and re-alleges paragraphs 1 through 149 as if each paragraph is repeated and re-alleged verbatim herein.

151.     Plaintiff was subjected to a hostile work environment on account of her pregnancy, sex, race and national origin in violation of Title IX, Title VI, and the Civil Rights Act of 1866, as amended, 42 U.S.C., § 1981, and the Rehabilitation Act.

## AND AS FOR AN EIGHT CAUSE OF ACTION

152.     Plaintiff repeats and re-alleges paragraphs 1 through 151 as if each paragraph is repeated and re-alleged verbatim herein.

153.     Plaintiff was subjected to retaliation for complaining about what she believed to be discriminatory terms and conditions of employment based on pregnancy, race, national origin and/or disability and/or for taking action to remedy what she believed to be same by appealing the discriminatory decision of Dr. Statter (in 2015 based on race) and in 2016 based on race, national origin, sex, pregnancy, and pregnancy related disability .

## AND AS FOR A NINTH CAUSE OF ACTION

154.     Plaintiff repeats and re-alleges paragraphs 1 through 153 as if each paragraph is repeated and re-alleged verbatim herein.

155.     Plaintiff was subjected to retaliation for complaining about what she believed to be discriminatory terms and conditions of employment based on her race when Defendant Statter refused and/or delayed to send her evaluation to Westchester Medical Center in July 2016, in

violation of Title VI and the Civil Rights Act of 1966, as amended, 42 U.S.C., section 1981.

## AND AS FOR A TENTH CAUSE OF ACTION

156.    Plaintiff repeats and re-alleges paragraphs 1 through 155 as if each paragraph is repeated and re-alleged verbatim herein.

157.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016, because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York City Administrative Code, § 8 *et seq.*

## AND AS FOR AN ELEVENTH CAUSE OF ACTION

158.    Plaintiff repeats and re-alleges paragraphs 1 through 157 as if each paragraph is repeated and re-alleged verbatim herein.

159.    Plaintiff was retaliated against for complaining about what she believed to be discrimination in terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016, because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York City Administrative Code, § 8 *et seq.*

## AND AS FOR A TWELFTH CAUSE OF ACTION

160.    Plaintiff repeats and re-alleges paragraphs 1 through 159 as if each paragraph is repeated and re-alleged verbatim herein.

161.    Plaintiff was subjected to a hostile work environment in the terms and conditions of her Residency Program because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York City Administrative Code, § 8 *et seq.*

### AND AS FOR THE THIRTEENTH CAUSE OF ACTION

162.    Plaintiff repeats and re-alleges paragraphs 1 through 161 as if each paragraph is repeated and re-alleged verbatim herein.

163.    Plaintiff was discriminated against in the terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016, because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York State Human Rights Law, § 280, as amended, in 2019.

### AND AS FOR THE FOURTEENTH CAUSE OF ACTION

164.    Plaintiff repeats and re-alleges paragraphs 1 through 163 as if each paragraph is repeated and re-alleged verbatim herein.

165.    Plaintiff was retaliated against for complaining about what she believed to be discrimination in terms and conditions of her Residency Program when Defendants refused/failed to promote her to PGY 5 in 2016, because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York State Human Rights Law, § 280, as amended, in 2019.

### AND AS FOR A FIFTEENTH CAUSE OF ACTION

166.    Plaintiff repeats and re-alleges paragraphs 1 through 165 as if each paragraph is repeated and re-alleged verbatim herein.

167    Plaintiff was subjected to a hostile work environment in the terms and conditions of her Residency Program because of her pregnancy, pregnancy related disability, her race and/or national origin in violation of the New York State Human Rights Law, § 280, as amended in 2019.

## AS FOR THE SIXTEENTH CAUSE OF ACTION

168.    Plaintiff repeats and re-alleges paragraphs 1 through 167 as if each paragraph is repeated and re-alleged verbatim herein.

169.    When Plaintiff started the Residency Program at MMC, there was no requirement that one must obtain a particular ABSITE score in order to be promoted to the next class and in fact, the relevant and guiding ACGME Rules which Plaintiff was aware of that guided the conditions for her promotion specifically provided otherwise and there was nothing in MMC rules and/or guidelines that provided that a particular ABSITE score was required and/or mandated and Plaintiff entered into the Residency Contract on the understanding that if she fulfilled its requirements which were known to her and which were the conditions under which she joined, she would be promoted.

170.    The Contract that Plaintiff entered into with MMC when she started her Residency Program had an implied covenant of good faith and fair dealing that the parties will deal with each other honestly, fairly, and in good faith, so as to not destroy the rights of Plaintiff and also that Plaintiff may receive the  benefits of the contract she entered into and Defendants breached that term with respect to the Contract with Plaintiff in the particular circumstances of this case and in the manner in which they breached the Contract with Plaintiff.

171.    Plaintiff fulfilled her terms and part-performed the Contact, Defendants breached the contract that they had with her when they included another requirement which was that she must obtain a particular ABSITE score to be promoted in 2015 and therefore breached their contract with Plaintiff. As a result of the breach, Plaintiff suffered damages and is still continuing to suffer damages and is entitled to both legal and equitable relief to remedy the breach and put

her in the same place where she would have been had the breach not occurred.

## AS FOR THE SEVENTEENTH CAUSE OF ACTION

172.    Plaintiff repeats and re-alleges paragraphs 1 through 171 as if each paragraph is repeated and re-alleged verbatim herein.

173.    When Plaintiff started the Residency Program at MMC, there was no requirement that one must obtain a particular ABSITE score in order to be promoted to the next class and in fact, the relevant and guiding ACGME Rules which Plaintiff was aware of that guided the conditions for her promotion specifically provided otherwise and there was nothing in MMC rules and/or guidelines that provided that a particular ABSITE score was required and/or mandated and Plaintiff entered into the Residency Contract on the understanding that if she fulfilled its requirements which were known to her and which were the conditions under which she joined, she would be promoted.

174.    The Contract that Plaintiff entered into with MMC when she started her Residency Program had an implied covenant of good faith and fair dealing that the parties will deal with each other honestly, fairly, and in good faith, so as to not destroy the rights of Plaintiff and also that Plaintiff may receive the  benefits of the contract she entered into and Defendants breached that term with respect to the Contract with Plaintiff in the particular circumstances of this case and in the manner in which they breached the Contract with Plaintiff.

175.    Plaintiff fulfilled her terms, Defendants breached the contract that they had with her when they included another requirement which was that she must obtain a particular ABSITE score to be promoted in 2016 and therefore breached their contract with Plaintiff. As a result of the breach, Plaintiff suffered damages and is still continuing to suffer damages and is entitled to

both legal and equitable relief to remedy the breach and put her in the same place where she would have been had the breach not occurred.

## AS FOR THE AN EIGHTEEN CAUSE OF ACTION

176.    Plaintiff repeats and re-alleges paragraphs 1 through 176 as if each paragraph is repeated and re-alleged verbatim herein.

177.    If it is found that Plaintiff had no express contract with Defendants, Plaintiff pleads that in the alternative, when Plaintiff started the Residency Program at MMC she had an implied contract with MMC which was breached as there was no requirement that one must obtain a particular ABSITE score in order to be promoted to the next class and in fact, the relevant and guiding ACGME Rules which Plaintiff was aware of that guided the conditions for her promotion specifically provided otherwise and there was nothing in MMC rules and/or guidelines that provided that a particular ABSITE score was required and/or mandated and Plaintiff entered into the Residency Program on the understanding that if she fulfilled its requirements which were known to her and which were the conditions under which she joined, she would be promoted.

178.    The implied contract that Plaintiff entered into with MMC when she started her Residency Program had an implied covenant of good faith and fair dealing that the parties will deal with each other honestly, fairly, and in good faith, so as to not destroy the rights of Plaintiff and also that Plaintiff may receive the  benefits of the contract she entered into and Defendants breached that term with respect to the Contract with Plaintiff in the particular circumstances of this case and in the manner in which they breached the Contract with Plaintiff.

179.    Plaintiff fulfilled her terms and part-performed the implied contract, Defendants

38

breached the contract that they had with her when they included another requirement which was

that she must obtain a particular ABSITE score to be promoted in 2015 and therefore breached

their contract with Plaintiff. As a result of the breach, Plaintiff suffered damages and is still

continuing damages and is entitled to both legal and equitable relief to remedy the breach and put

her in the same place where she would have been had the breach not occurred.

## AS FOR THE NINETEENTH CAUSE OF ACTION

180.    Plaintiff repeats and re-alleges paragraphs 1 through 171 as if each paragraph is

repeated and re-alleged verbatim herein.

181.    If it is found that Plaintiff had no express contract with Defendants, Plaintiff

pleads that in the alternative, when Plaintiff started the Residency Program at MMC she had an

implied contract with MMC which was breached as there was no requirement that one must

obtain a particular ABSITE score in order to be promoted to the next class and in fact, the

relevant and guiding ACGME Rules which Plaintiff was aware of that guided the conditions for

her promotion specifically provided otherwise and there was nothing in MMC rules and/or

guidelines that provided that a particular ABSITE score was required and/or mandated and

Plaintiff entered into the Residency Contract on the understanding that if she fulfilled its

requirements which were known to her and which were the conditions under which she joined,

she would be promoted.

182.    The implied contract that Plaintiff entered into with MMC when she started her

Residency Program had an implied covenant of good faith and fair dealing that the parties will

deal with each other honestly, fairly, and in good faith, so as to not destroy the rights of Plaintiff

and also that Plaintiff may receive the  benefits of the contract she entered into and Defendants

breached that term with respect to the Contract with Plaintiff in the particular circumstances of this case and in the manner in which they breached the Contract with Plaintiff.

183.    Plaintiff fulfilled her terms, Defendants breached the contract that they had with her when they included another requirement which was that she must obtain a particular ABSITE score to be promoted in 2016 and therefore breached their contract with Plaintiff. As a result of the breach, Plaintiff suffered damages and is still continuing damages and is entitled to both legal and equitable relief to remedy the breach and put her in the same place where she would have been had the breach not occurred.

184.    Plaintiff is entitled to the specific performance of the contract (whether express or implied) and has altered her position and equity demands not only specific performance, but an Order directing that she be readmitted to the Program.

## AS FOR THE TWENTIETH CAUSE OF ACTION

185.    Plaintiff repeats and re-alleges paragraphs 1 through 184 as if each paragraph is repeated and re-alleged verbatim herein.

186.    Because of Plaintiff's pregnancy, child birth and health problems associated with them, Plaintiff was unable to have adequate time to prepare for ABSITE and therefore was not able to score up to the 30th percentile set by the Board when they granted her appeal and based on Plaintiff's special circumstances which she had notified MMC of, she had asked for another opportunity to take the text but has been denied/refused.

187.    In denying her another opportunity to take the test, Defendants failed to reasonably accommodate Plaintiff in violation of Title IX,  the Rehabilitation Act, the New York City Administrative Code as well as under the New York State Human Rights Law, as amended,

in 2019..

189.    As a result of the actions of the Defendants which had been recounted heretofore, Plaintiff suffered serious emotional distress, lost wages, was otherwise damaged and the actions of the Defendants were callous and intentional and Plaintiff is entitled to punitive damages against each and every one of them, individually as well as against MMC.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally:

i.  Awarding her general compensatory damages in the amount to be proved at trial in accordance with proof;

ii.  Awarding her back wages and front pay in the amount to be proved at trial with interest;

iii. Declaring that the Defendants violated Plaintiff's rights under the Title VI, Title IX, the Rehabilitation Act, 42 U.S.C., § 1981, the New York City Administrative Code, and/or the New York State Human Rights Law;

iv. Reinstating Plaintiff to the Program with appropriate Orders preventing the individual Defendants from further meddling in or interfering with Plaintiff's Residency Program;

v. Granting Plaintiff specific performance of her contract with Defendants and making all appropriate orders that would lead to her getting the benefits of her bargain which include, but are not limited to reinstating her to the Program and removal of the individual Defendants from further supervision of Plaintiff's Residency Program;

iv. Awarding her costs, attorneys fees and expenses in the amount to be proved at trial and in accordance with proof under appropriate laws that provide for such;

41

v. Awarding plaintiff damages for hostile work environment and for emotional distress under relevant laws that provide for such;

vi. Awarding punitive damages under relevant laws and in accordance with proof;

vii. Awarding any other relief that plaintiff be shown entitled to.


Dated:   Brooklyn, New York
         October 28, 2019

                                       LAW OFFICES OF ANTHONY OFODILE
                                       Attorneys for Plaintiff Ojinika Ikedilo, M.D.

                                       By: _____
                                       ANTHONY C. OFODILE, ESQ.
                                            498 Atlantic Ave.
                                            Brooklyn, NY 11217
                                            Tel. No.:  (718) 852-8300
                                            FaxNo.: (718) 852-7361
                                            Email: acofodile@aol.com

 UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------x
OJINIKA IKEDILO, M.D.,                                    Index No.:

                    Plaintiff,
              -against-

MINDY STATTER, M.D.,
JODY KABAN, M.D.,
SCOTT MELVIN, M.D., and
MONTEFIORE MEDICAL CENTER,

                    Defendants
---------------------------------------------x

x--------------------------------------------------------------------------------------x

**COMPLAINT**

x----------------------------------------------------------------------------------x
        Signature (Rule 130-1.1-a)

x----------------------------------------------------------------------------------x


Dated: Brooklyn, New York
        October 28, 2019


                    LAW OFFICES OF ANTHONY OFODILE
                            Attorneys for Plaintiff
                            498 Atlantic Avenue
                        Brooklyn, New York 11217
                            (718) 852-8300
                        ACOfodile@aol.com