UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

OJINIKA IKEDILO, M.D.

Plaintiff,

v.

MINDY STATTER, M.D. JODY KABAN,
M.D. SCOTT MELVIN, M.D. and
MONTEFIORE MEDICAL CENTER,

Defendants.

</td></tr>
</table>

┌─────────────────────────────┐
│ **USDC-SDNY** │
│ **DOCUMENT** │
│ **ELECTRONICALLY FILED** │
│ **DOC#:** │
│ **DATE FILED:** 9/30/2020 │
└─────────────────────────────┘

No. 19-CV-9967 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Ojinika Ikedilo, M.D., a former surgical resident at Montefiore Medical Center

("Montefiore"), commenced this action against Defendants Mindy Statter, M.D., Jody Kaban,

M.D., Scott Melvin, M.D. and Montefiore.  Plaintiff asserts claims for discrimination, hostile

work environment, and retaliation based on her race, national origin and/or pregnancy in

violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VI of the

Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.*; Section 504 of the

Rehabilitation Act ("Section 504"), 29 U.S.C. §§ 794 *et seq.*; Title IX of the Education

Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*; the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; and the New York City Human Rights Law

("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.*.  She also brings claims for failure to

accommodate her alleged disability and pregnancy under Title IX, Section 504, the NYSHRL,

and the NYCHRL.  Lastly, she asserts supplemental common law claims.  Now before the Court

is Defendants' motion to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure

12(b)(6).  For the reasons that follow, the motion is granted.

**BACKGROUND**

The following facts are drawn from Plaintiff's Complaint, Dkt. 1 ("Compl."), and are assumed to be true for the purposes of resolving this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

I.    **Post-Graduate Years 1 and 2 (July 2011 – 2013)**

Plaintiff, a Black woman of Nigerian descent, was accepted as a post-graduate year-1 ("PGY1") preliminary intern at Montefiore on July 1, 2011.  Compl. ¶ 11.  Based on her performance, she was offered a categorical PGY1 position starting on July 1, 2012.  *Id*. ¶12. Plaintiff progressed to Montefiore's PGY2 program.  During the second half of the PGY2 program, Defendant Statter became the Program Director of the Residency Program.  *Id*. ¶ 14. Plaintiff alleges that she did not interact with Defendant Statter other than occasionally speaking with her during consults or class meetings and at her milestone evaluation at the end of the year. *Id*.

II.   **Post-Graduate Year 3 (July 2013 – 2014)**

After Plaintiff advanced to PGY3, she became pregnant.  *Id*. ¶ 16.  During her first trimester, while she was in a vascular surgery rotation, she was asked to perform procedures involving radiation.  *Id*.  Plaintiff requested to perform these procedures at another time in light of the early stage of her pregnancy and the possible side effects of radiation.  *Id*.  Plaintiff does not state whether her request to perform the procedures at a later date was granted, but alleges that she was "not liked during that month."  *Id*. ¶ 17.

Plaintiff's only exposure to Defendant Statter that year was during May-June 2014, when Plaintiff functioned as the Pediatric Surgery Chief Resident for the month.  *Id.* ¶ 20.  During the first day of the rotation, Defendant Statter told Plaintiff that she "cannot make any decisions

during this rotation without clearing it with an Attending or Bob, the Department's long time [Physician's Assistant], if the Attending is not available." *Id.* ¶ 21. Plaintiff contends in a conclusory fashion that Defendant Statter placed this limitation on Plaintiff because of her race, national origin, and pregnancy-related disability. *Id.* ¶ 22. At the end of the rotation, Defendant Statter wrote that Plaintiff was "passive during the rotation waiting for people to tell her what to do." *Id.* ¶ 24. Plaintiff was the only Black PGY3 resident at the time. *Id.* ¶ 22. Plaintiff asserts, on information and belief, that very few Black residents were admitted into the program during Defendant Statter's tenure as Program Director. *Id.*

During Plaintiff's elective month, Plaintiff realized that a graduating chief resident had logged surgeries that Plaintiff had completed as his own. *Id.* ¶ 25. When Plaintiff brought the issue to Defendant Statter's attention, Defendant Statter told her that "if Plaintiff had logged her cases timely, this Resident would not have stolen them." *Id.* Plaintiff contends that Defendant Statter's decision to blame her and refuse to correct the "academic fraud" was due to Plaintiff's race, national origin, sex, pregnancy-related disability, and her request for a pregnancy-related accommodation. *Id.* ¶ 26.

Plaintiff was placed on bed rest and received a cerclage in week 23 of her pregnancy, experienced preeclampsia towards the end of her pregnancy, and was induced due to high blood pressure. *Id.* ¶ 19. She nonetheless worked and operated until the day she was induced. *Id.* ¶ 19. Plaintiff delivered her daughter on June 20, 2014. *Id.* ¶ 27.

### III.    Post-Graduate Year 4 (July 2014 – 2015)

On July 14, 2014, following maternity leave, Plaintiff returned to work as a PGY4 resident. *Id.* She performed more surgical cases than she had in the prior year in an attempt to catch up with the cases she had missed when she was pregnant and on maternity leave. *Id.* After

returning to work, Plaintiff "realized that the demeanor of many of the surgeons had changed negatively towards her and later found out that it was a direct result of Dr. Statter's machinations and pressure to Staff to ensure that Plaintiff did not successfully graduate from the Program." *Id*. ¶ 28.  For example, Plaintiff claims that Defendant Statter "started preemptively communicating with Attendings before Plaintiff's rotation with each of them, poisoning their minds against her, and directing that Plaintiff be singled out, monitored and scrutinized more closely for medical errors [and] patient complaints." *Id*. ¶ 29.

Dr. Smith informed Plaintiff in December 2014 that Defendant Statter had instructed him to monitor Plaintiff closely and give her feedback. *Id*. ¶ 30.  When Plaintiff asked Dr. Smith for feedback, he advised her that she was doing "OK" and told her that she needed to improve her laparoscopic skills. *Id*.

Plaintiff asserts that Defendant Statter "starting taking the sides of other Residents no matter what the situation or circumstances were and even when Plaintiff had manifestly not done anything wrong." *Id*. ¶ 31.  For example, when another resident overslept and did not show up on time to cover for Plaintiff in the Trauma Unit so that Plaintiff could attend Defendant Statter's PGY4 monthly meeting, Defendant Statter "yelled" at Plaintiff, told the other resident to "babysit Plaintiff next time," and told the class that Plaintiff was "unorganized." *Id*. ¶ 32.

In another incident, Plaintiff was the first resident to see a patient whom another resident had taken care of for three days before the patient's demise. *Id*.  ¶ 33.  During a meeting, the other resident was called on to give a presentation regarding the patient, but stated that Plaintiff should do so. *Id*.  Plaintiff felt it would be inappropriate for her to present on the patient, but Defendant Statter stated that she would include a "failure of clinical competence" in Plaintiff's file if Plaintiff did not immediately start presenting. *Id*.

4

On another occasion, Plaintiff missed a clinical lab because she was covering the Trauma

Unit when a critical case arose that required her to go to the operating room. *Id*. ¶ 35. After

Plaintiff emailed Defendant Statter to explain why she had missed the clinical session, Defendant

Statter responded that she would document the incident in Plaintiff's file as a "failure of clinical

competence." *Id*. Plaintiff claims that these incidents, among "other instances of Dr. Statter

picking on Plaintiff," subjected Plaintiff to a hostile work environment based on race, national

origin, pregnancy, and disability. *Id*. ¶ 36.

In February 2015, Plaintiff received and executed her PGY5 contract for the July 2015-

2016 academic year. *Id*. ¶ 37. In March 2015, results of the PGY4 ABSITE test were released

and Plaintiff learned that she had performed "poorly"—below the 30th percentile—as had other

residents.[1] *Id*. ¶¶ 38, 43. Plaintiff states that "Dr. Statter was not happy about it" and asked the

residents to do more practice questions. *Id*.

That same month, Plaintiff requested a letter of recommendation in support of her

application for a Trauma/Critical Care Fellowship. *Id*. ¶ 39. Plaintiff alleges, upon information

and belief, that Defendant Statter requested a composite evaluation of Plaintiff from the Surgical

Attending Staff and discussed Plaintiff's performance at the next House Staff meeting. *Id*. ¶ 40.

The letter of recommendation was withheld. *Id*. ¶ 40. Plaintiff contends, on information and

belief, that Defendant Statter also sought to derail the progress of two other Nigerian residents.

*Id*. ¶¶ 41, 42. Plaintiff also claims that other residents who scored below the 30th percentile

---

[1] ABSITE is the American Board of Surgery In-Training Examination offered annually to general surgery
residency programs. It is a multiple-choice exam designed to measure the progress attained by residents in
their knowledge of applied science and management of clinical problems related to surgery. *See*
http://www.absurgery.org/default.jsp?certabsite.

were promoted and allowed to graduate.  *Id*. ¶ 43.

On March 21, 2015, Plaintiff's Trauma composite evaluation was submitted containing evaluations by General Surgery and Vascular Surgery attendings.  *Id*. ¶ 47.  The Trauma evaluation stated that it was a consensus yet included evaluations by surgeons with whom Plaintiff had not worked during her Trauma rotation.  *Id*. ¶¶ 47, 54.  She alleges that some members of the Trauma team wrote "bad" evaluations of her, but that her evaluations from attendings who had actually worked with her were satisfactory, with the exception of the evaluation written by Dr. Smith, who also gave other residents bad evaluations.  *Id*. ¶ 48.  Plaintiff was "disappointed and shocked" by the evaluation.  *Id*. ¶ 54.  She asserts that to the best of her knowledge, she had not made medical or surgical errors, had not been the subject of patient complaints, and had not placed patients at risk.  *Id*. ¶¶ 48, 54.  She claims that she "could not understand any logical basis for the evaluation other than the predetermined result that Dr. Statter wanted and asked for."  *Id*. ¶ 55.

In March 2015, Plaintiff met with Defendant Statter and her mentor, Dr. Stone.  *Id*. ¶¶ 53, 55.  During that meeting, Defendant Statter told Plaintiff she had to repeat PGY4.  *Id*. ¶ 56.  Plaintiff argued, to no avail, that "her difficult pregnancy and new child made it difficult for [her] to study for the ABSITE test," that it was unfair to single her out when others had scored below the 30th percentile on the test, and that she deserved some slack in light of her role as Chief Resident.  *Id*.  She also pointed out that she had only received bad evaluations in two out of twelve rotations, and that Dr. Smith had also given bad evaluations to other residents.  *Id*. ¶ 57.

Plaintiff alleges that holding her back due to her low ABSITE score was a violation of the

ACGME Rules governing the promotion of residents.[2]  *Id*. ¶¶ 52, 118.  She also contends that when she applied to and began the Montefiore Residency Program, she was never informed of a requirement that a resident must attain a particular ABSITE score in order to be promoted to the next class.  *Id*. ¶¶ 52, 118.  She further claims that other residents with low ABSITE scores were promoted, and that there is evidence that some people with low ABSITE scores go on to pass the Board.  *Id*. ¶¶ 118-19, 132.  In fact, Dr. Teperman told Plaintiff that no one else had ever been held back in the history of the program's 10 years because of a low ABSITE score.  *Id*. ¶ 44.

Also in March 2015, Plaintiff began a rotation in minimally invasive procedures with Dr. Camancho.  *Id*. ¶ 58.  On the first day of the rotation, Plaintiff and the junior resident completed their Rounds at 6:45 a.m. and, instead of waiting for Dr. Camancho to arrive to go over scheduled cases at 7:30 a.m., they went for breakfast, arriving back at 7:14 a.m.  *Id*.  Dr. Camancho berated them and sent them home for the day.  *Id*.  Plaintiff alleges that "[t]his first day's interaction and reaction to Plaintiff was because of Dr. Statter's direction that Plaintiff be singled out and monitored in a special way."  *Id*. ¶ 59.  Dr. Camancho told Plaintiff that he had been directed to monitor her and strictly supervise her because she was refusing to repeat the year, but that he found her work satisfactory.  *Id*. ¶ 60.

On May 1, 2015, Defendant Statter informed Plaintiff that the House Committee did not have enough evidence to make a decision as to whether Plaintiff had to repeat PGY4.  *Id*. ¶ 62.  Accordingly, Plaintiff was asked to perform six cases and submit pre-op worksheets, operative assessment forms, clinic forms, and Cameo forms by May 13, 2015.  *Id*. ¶ 62.  Although

---

[2] ACGME stands for the Accreditation Council for Graduate Medical Education.  *See* https://www.acgme.org/.

Defendant Statter identified a few surgeons who were aware of the requirement that Plaintiff perform six cases and submit documentation, Plaintiff understood Defendant Statter to advise her to conduct the six cases with Dr. Etkin Moran.  *Id*. ¶ 64.  Plaintiff performed all six cases with Dr. Moran, who gave her a negative evaluation, although Plaintiff contends Dr. Moran's evaluation was "cancel[ed] out" by the positive evaluation of another doctor.  *Id*. ¶ 66.  Plaintiff claims that Defendant Statter told the House Committee that she had instructed Plaintiff to complete the cases with Defendant Melvin, which Plaintiff had failed to do, rather than Dr. Moran.  *Id*. ¶ 66.  Plaintiff alleges that Defendant Kaban, the Assistant Program Director of the Residency Program, and Defendant Statter engaged in "deliberate deceit of the House Committee in telling them that Plaintiff was insubordinate in failing to follow her specific direction to do the cases with Dr. Melvin."  *Id*. ¶ 67.  Plaintiff received a letter in June 2015 directing her to repeat PGY4.  *Id*.

Plaintiff completed six additional cases with Defendant Melvin, who told her that her performance was satisfactory.  *Id*. ¶ 68.  Although Plaintiff contends that she presented the required paperwork to Defendant Melvin before each case, "Dr. Melvin who at this time was in league with and acting with Drs. Statter and Koban denied that Plaintiff brought the paperwork." *Id*.

Upon receipt of the letter in June 2015, Plaintiff spoke with Defendants Statter and Melvin to request that she be allowed to move up to PGY5, but under the direct monitoring of Defendant Melvin.  *Id*. ¶ 69.  Defendant Melvin recommended that Plaintiff be terminated outright rather than repeat PGY4.  *Id*.  Defendant Statter insisted that for Plaintiff to remain in the Residency Program, she had to immediately begin repeating PGY4, even though Plaintiff had decided to appeal the House Committee's decision that she repeat PGY4.  *Id*. ¶ 70.

8

IV.     **Repeat of Post-Graduate Year 4 (July 2015 – 2016)**

In or about June 2015, at Defendant Statter's insistence, Plaintiff began repeating PGY4 even though her appeal of the House Committee's decision was not yet resolved.  *Id.*  Plaintiff contends that she was subjected to a hostile work environment in the ensuing months.  *Id.* ¶¶ 71-74.

On October 22, 2015, the appeal process took place.  *Id.* ¶ 75.  The decision on appeal, dated November 8, 2015, upheld the House Committee's decision to direct Plaintiff to repeat PGY4.  *Id.*  Only once the appeal failed did Plaintiff start the pre-op worksheets and operative assessment forms as instructed by Defendant Statter.  *Id.*

In November 2015, Plaintiff met with Dr. Stone for her semi-annual review.  *Id.* ¶ 76. Dr. Stone told Plaintiff that her evaluations had shown improvement, but inquired as to whether something had happened during the Moses Vascular rotation and suggested that Plaintiff ask for mid-rotation feedback to avoid surprises in her evaluations.  *Id.* ¶¶ 76-77.  Dr. Stone rated Plaintiff's medical knowledge "met requirement" and encouraged her to study hard for the upcoming ABSITE.  *Id.* ¶¶ 77-78.  In December 2015, Defendant Statter changed Plaintiff's medical knowledge rating to "requires attention."  *Id.* ¶ 78.

In January 2016, Plaintiff executed her PGY5 Contract.  *Id.* ¶ 80.  On February 2, 2016, she took the ABSITE test.  *Id.* ¶ 81.  Plaintiff received her ABSITE results in March and learned that she had "performed poorly" again.  *Id.*  In February, Defendant Statter emailed Plaintiff to remind her that pursuant to the terms of her repeating PGY4, she was required to document meetings with her mentors.  *Id.*  In February and March 2016, Plaintiff met with her mentors Dr. Sreeramoju and Dr. Smith, respectively.  *Id.*  Dr. Smith told Plaintiff that he was unaware of anything that would prevent Plaintiff from being promoted to PGY5.  *Id.* ¶ 82.

9

Also in February 2016, Plaintiff found out that she was pregnant, and in late March 2016, she informed some of the attendings and residents. *Id*. ¶¶ 83-84. Plaintiff sought an accommodation of a few days off because she needed a preventive cerclage. *Id*. ¶¶ 83, 93. Plaintiff does not allege whether she was granted or denied that accommodation.

Plaintiff received an email on April 13, 2016 asking her to meet with Defendants Statter and Melvin. *Id*. ¶ 84. In an April 18, 2016 meeting, Plaintiff was informed that her residency would be terminated by the end of June, 2016. *Id*. The stated reason for her dismissal from the Residency Program was that "she did not receive an ABSITE score above 30th percentile, in addition to her un-professionalism, not communicating with her team and her technical skills." *Id*. ¶ 85. In addition, Defendant Statter stated that she believed that Plaintiff had only met with Dr. Sreeramoju and did not complete the pre-op worksheets or the operative forms. *Id*. ¶ 86. Plaintiff told Defendant Statter that she had met with Dr. Stone in December, was on vacation during the first two weeks of January, and was on night float the rest of January and thus had not completed the required documentation for that month. *Id*. ¶ 87. She further advised Defendant Statter that she had met with Dr. Sreeramoju in February and with Dr. Smith in March, and that she intended to meet with Defendant Melvin in April. *Id*.

Plaintiff contends that Defendant Statter "discounted the evaluations that supported Plaintiff's technical and communication skills as inaccurate and false because they did not advance her discriminatory purpose." *Id*. ¶ 88. Plaintiff alleges that the reasons given by Defendant Statter for dismissing her from the program were pretextual, the real reasons being discrimination and retaliation due to her most recent pregnancy and need for accommodation, as well as discrimination due to her race and Nigerian national origin. *Id*. ¶¶ 88-95, 124.

Defendants Melvin and Statter allegedly asked Plaintiff to resign from the Program and

avoid the appeal process.  *Id*. ¶ 94.  After they refused to rescind their decision to terminate

Plaintiff, Plaintiff emailed Defendant Statter on April 27, 2020 and advised her that she would be

appealing the decision not to promote her to PGY5.

In May 2016, Plaintiff started the Minimally Invasive rotation with Drs. Camancho and

Moran.  *Id*. ¶ 98.  In June 2016, Drs. Camancho and Moran each gave Plaintiff a negative

evaluation of her performance during the rotation.  *Id*. ¶ 100.

## V.   Fellowship at Westchester Medical Center (July 2016 – July 2017)

Plaintiff applied for a surgical critical care fellowship position at Westchester Medical

Center ("WMC").  *Id*. ¶ 102.  Plaintiff planned to complete the fellowship in the 2016-2017

academic year, allowing her time to study for USMLE step 3 and the ABSITE so that she could

return to Montefiore to complete the PGY5 during the 2017-2018 academic year.[3]  *Id*. ¶ 126.

WMC offered Plaintiff the fellowship subject to its receipt of a summary evaluation of her

performance.  *Id*. ¶¶ 102-103.  On an unspecified date, Plaintiff requested that Defendant Statter

provide a summary evaluation to WMC so that she could begin her fellowship.  *Id*. ¶ 103.  A

week later, WMC informed Plaintiff that it had not yet received the summary evaluation.  *Id*. ¶

104.  On July 25, 2016, Plaintiff texted Defendant Statter requesting that she send the evaluation.

*Id*. ¶ 106.  Dr. Stone called Plaintiff that evening to inform her that Defendant Statter would not

release the evaluation unless Plaintiff resigned from Montefiore's Residency Program and

withdrew her appeal, and that if Defendant Statter did send the evaluation, it would be negative.

*Id*. ¶ 105.  Plaintiff told Dr. Stone that she saw no reason to resign from a program where she had

---

[3] The United States Medical Licensing Examination ("USMLE") is a three-step test. *See* https://www.usmle.org/step-3/.  Step 3 is the final examination in the USMLE sequence leading to a license to practice medicine in the United States without supervision. Step 3 provides a final assessment of physicians assuming independent responsibility for delivering general medical care.

already been terminated and that she did not intend to cancel the appeal process. *Id*. ¶ 107. She also stated that the failure to send the summary evaluation had already prevented her from working for a month. *Id*. ¶. Plaintiff emailed Defendant Statter on July 27, 2016 objecting to Defendant Statter's decision to condition the release of the evaluation on Plaintiff's resignation from the Residency Program. *Id*. ¶ 108. That same day, Plaintiff spoke to Defendant Statter by phone, informed her that she was tape recording their conversation, and stated that she believed that Defendant Statter was blackmailing her. *Id*. ¶ 109. Defendant Statter called Plaintiff again later that day to advise her that Plaintiff would be paid her salary for July 2016, her benefits would be reinstated, and her summary evaluation would be sent to WMC. *Id*. ¶ 110.

## VI.   Plaintiff's Appeal, Second Pregnancy, and Thyroid Problem

Plaintiff's appeal of her termination from the Residency Program was decided in November 2016. *Id*. ¶ 127. She was informed that she would be reinstated into the Residency Program by July 1, 2017 so long as by March 31, 2017, she advised Montefiore's Department of Surgery that she had passed the USMLE Step 3 examination and had taken the ABSITE examination by January 27, 2017 and achieved at least a 30th percentile score. *Id*.

In November 2016, Plaintiff gave birth to her daughter. *Id*. ¶ 128. She was also diagnosed with a thyroid problem that was thought to be cancerous, giving her little time to study for the ABSITE. *Id*. Plaintiff did not score over the 30th percentile on the January 27, 2017 ABSITE. *Id*. Plaintiff requested "another opportunity and an accommodation in light of her medical situation but Defendants have failed to give [the] same to Plaintiff." *Id*. ¶ 131.

Plaintiff successfully completed her WMC fellowship and is a licensed physician in the State of New York. *Id*. ¶ 130. She claims that the only thing preventing her from practicing as a surgeon is the fact that she has not completed the PGY5 program. *Id*.

**PROCEDURAL HISTORY**

Plaintiff filed the Complaint on October 28, 2019, asserting twenty causes of action under Section 1981, Title VI, Section 504, Title IX, the NYSHRL, the NYCHRL, and New York State common law. Dkt. 1. On December 27, 2019, Defendants filed a motion to dismiss. Dkts. 24 & 25 ("MTD"). On February 14, 2020, Plaintiff filed her opposition to the motion to dismiss, Dkt. 35 ("MTD Opp'n") and a supporting affidavit, Dkt. 34, and on February 21, 2020, Defendants filed their reply, Dkt. 36 ("MTD Reply").

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). The Court, however, need not credit "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

**DISCUSSION**

**I.   Statute of Limitations**

As an initial matter, Defendants contend that Plaintiff's claims under Title IX, Title VI, and Section 504 are subject to a three-year statute of limitations. The Court agrees. *See Irrera v.*

*Humpherys*, 695 Fed. App'x. 626, 628 (2d Cir. 2017) (citing *Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004) (applying three-year statute of limitations to Title IX claims); *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (applying three-year statute of limitations to Title VI claims); *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) (applying three-year statute of limitations to Section 504 claims). Plaintiff commenced this action on October 28, 2019. Accordingly, all Title IX, Title VI, and Section 504 claims that accrued prior to October 28, 2016 are time barred.

The parties agree that Plaintiff's Section 1981 claims are subject to a four-year statute of limitations. *See* MTD Reply at 2 ("The parties do not dispute that a four-year statute of limitations applies to claims asserted pursuant to 42. U.S.C. § 1981.") Defendants mistakenly contend, however, that "all of Plaintiff's [Section 1981] claims that accrued prior to October 28, 2016 are time barred," and argue that the claims regarding the termination of Plaintiff's residency accrued on April 18, 2016, the date on which Plaintiff learned of the termination, rather than on November 2016, the date on when Plaintiff's appeal was resolved. *See* MTD Reply at 2-5. Yet given that Plaintiff's Section 1981 claims are subject to a four-year statute of limitations—which Defendants do not dispute—only those claims accruing prior to October 28, 2015, not 2016, are time barred. Accordingly, the Court need not need decide whether Plaintiff's Section 1981 claims regarding the termination of her residency accrued on April 18, 2016 or November 2016, as both are within the four-year statute of limitations.

The Court does, however, need to determine when Plaintiff's Section 1981 claim regarding the failure to promote her to PGY5 in 2015 accrued. Plaintiff received a letter in June 2015 directing her to repeat PGY4, Compl. ¶ 67, and learned on November 8, 2015 that the decision had been upheld on appeal, *id*. ¶ 75. The Court holds that this claim accrued on June

14

2015, when Plaintiff learned she would need to repeat PGY4, and is thus barred by the statute of limitations. *See Del. State College v. Ricks*, 449 U.S. 250, 257-61 (1980) (holding Section 1981 claim ripened on the date the plaintiff's "tenure decision was made and communicated," not the date on which his contract was terminated or his grievance was denied). Plaintiff's Section 1981 claim regarding Defendant Statter's failure to timely send her evaluation summary to WMC in July 2016, by contrast, falls squarely within the statute of limitations. Because Defendants mistakenly calculated that only Plaintiff's Section 1981 claims accruing after October 28, 2016, not 2015, fell within the statute of limitations, they did not oppose this claim on the merits.

In sum, the Court dismisses the following counts—or subsets of counts—as barred by the statute of limitations:

- Count One alleges Defendants violated Title VI and Section 1981 by failing to promote Plaintiff to PGY5 in 2015. Both claims are barred by the statute of limitations.

- Count Three alleges Defendants violated Title VI and Section 1981 by failing to timely send Plaintiff's evaluation summary to WMC in July 2016. The Title VI claim, but not the Section 1981 claim, is barred by the statute of limitations.

To the extent that any of Plaintiff's remaining Title VI, Title IX, and Section 504 claims are focused on alleged discriminatory or retaliatory acts occurring prior to October 28, 2016, and to the extent any of her remaining Section 1981 claims are focused on alleged discriminatory or retaliatory acts occurring prior to October 28, 2015, those claims are also dismissed.

## II.    Plaintiff's Title VI, Title IX, and Section 504 Claims Against Defendants Statter, Kaban, and Melvin are Dismissed

Defendants next argue that Plaintiff's Title VI, Title IX, and Section 504 claims against Defendants Statter, Kaban, and Melvin must be dismissed, as individual defendants cannot be held liable under those statutes. The Court agrees, and thus dismisses those claims. *See Verdi v.*

15

*City of New York*, 306 F. Supp. 3d 532, 542 (S.D.N.Y. 2018) (Title VI does not encompass

individual liability); *Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 426-27 (S.D.N.Y. 2008)

(same with respect to Title IX); *Castro v. City of N.Y.*, 24 F.Supp.3d 250, 259 (E.D.N.Y. 2014)

(same with respect to Section 504).

III.     **Plaintiff's Section 1981, Title VI, Title IX, and Section 504 Claims That
         Defendants' Failure to Promote Her to PGY5 in 2016 Constitutes Unlawful
         Discrimination is Dismissed**

      Plaintiff contends that Defendants' failure to promote her to PGY5 in 2016 constitutes

unlawful discrimination on the basis of her race, national origin, sex, pregnancy status, and

disability in violation Section 1981, Title VI, Title IX, and Section 504.  For the reasons that

follow, these claims are dismissed.

      Plaintiff's Section 1981, Title VI, Title IX, and Section 504 claims are all governed by

the familiar *McDonnell Douglas* burden-shifting framework.  *See Littlejohn v. City of New York*,

795 F.3d 297, 312 (2d Cir. 2015) (Section 1981 claims are "subject to the burden-shifting

evidentiary framework set forth in *McDonnell Douglas*"); *Doe v. Columbia Univ.*, 831 F.3d 46,

56 (2d Cir. 2016) (same for Title IX); *Koumantaros v. City Univ. of New York*, No. 03-CV-

10170 (GEL), 2007 WL 840115, at *8 (S.D.N.Y. Mar. 19, 2007) (same for Title VI); *Atencio v.

U.S. Postal Serv.*, 198 F.Supp.3d 340, 355 (S.D.N.Y. 2016) (same for Section 504).

      Under the *McDonnell Douglas* framework, a plaintiff must establish the following four

elements of a *prima facie* case of discrimination: "(1) she is a member of a protected class; (2)

she is qualified for her position; (3) she suffered an adverse . . . action; and (4) the circumstances

give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d

Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973)).  However, "a

plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test

was originally formulated, to defeat a motion to dismiss." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir.2015) (internal quotation marks omitted). "Indeed, as concerns the fourth prong, 'a plaintiff need only give plausible support to a minimal inference of discriminatory motivation.'" *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (quoting *Vega*, 801 F.3d at 84). "Nevertheless, 'a discrimination complaint . . . must [still] at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed.'" *Id.* (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir.2014)). "Additionally, 'the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim.'" *Id.* (quoting *Littlejohn*, 795 F.3d at 311 n. 9).

Even under the more permissive motion to dismiss standard, Plaintiff fails to plausibly allege the fourth element of her *prima facie* case—that Defendants' decision not to promote her occurred under circumstances that give rise to an inference of discrimination. Plaintiff has not alleged that Defendants made a single disparaging or derogatory comment with respect to her race, sex, pregnancy, or disability. Other than asserting in a conclusory manner that Defendants were motivated by discriminatory intent, Plaintiff has not alleged any facts supporting an inference that Defendants' decision to terminate her residency rested on anything other than her poor performance. Defendants informed her that she would not be promoted to PGY5 because "she did not receive an ABSITE score above 30th percentile, in addition to her un-professionalism, not communicating with her team and her technical skills." Compl. ¶ 85. Indeed, Plaintiff failed to receive over 30 percent on her 2015 and 2016 ABSITE exams, *id*. ¶¶ 38, 43, 81, 85, and received numerous negative evaluations on at least two of her recent rotations, *id*. ¶ 57. Even after Plaintiff won an appeal and learned she would be reinstated into

the Residency Program if she passed the USMLE Step 3 examination and scored in the 30th

percentile on the ABSITE exam, she failed to meet the Defendants' objective, nondiscriminatory

criteria for reinstatement.  *Id*. ¶¶ 127-28.

Nor has Plaintiff alleged other facts that would give rise to an inference of discrimination.

Although Plaintiff filed an affidavit in support of her opposition to Defendants' motion to

dismiss in which she alleges that some white and Jewish residents were allowed to advance in

the Residency Program despite scoring poorly on the ABSITE, these facts were never included

in Plaintiff's Complaint and thus are not properly considered on a motion to dismiss.  *See*

*Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) ("In adjudicating a Rule

12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the

complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken.") (internal quotation marks

omitted).

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's Section 1981,

Title VI, Title IX, and Section 504 claims regarding Defendants' refusal to promote Plaintiff to

PGY5.

## IV.    Plaintiff's Section 1981 Claim Regarding Defendant Statter's Failure to Timely Send Her Evaluation Summary to WMC in July 2016 is Dismissed

Although, for the reasons described above, Defendants did not address Plaintiff's Section

1981 claim regarding Defendant Statter's failure to timely send the evaluation summary to WMC

on the merits, the Court nonetheless dismisses the claim *sua sponte*.  *See Houston v. Manheim-*

*New York*, 475 F. App'x 776, 779 (2d Cir. 2012) ("A district court has the inherent authority to

dismiss a frivolous complaint *sua sponte*) (internal quotation marks and citations omitted).

18

Even at the motion to dismiss stage, a plaintiff bringing a Section 1981 claim "bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). Here, Plaintiff fails to plausibly allege any connection between her race and Defendant Statter's delay in sending her evaluation summary—much less that her race was the "but for" cause of the delay. Plaintiff does not allege that Defendant Statter ever commented on Plaintiff's race, or that she more promptly provided evaluations for residents of other races. Plaintiff's allegation that Defendant Statter only admitted a few Black residents during her tenure as Program Director is far too attenuated to support an inference that Plaintiff's race was the but-for cause of Defendant Statter's delay in sending her program evaluations. The Court thus concludes that Plaintiff has failed to plausibly establish that Defendant Statter would have sent the evaluation more promptly but for Plaintiff's race.

In addition, Plaintiff has failed to plausibly allege that she, in fact, experienced any injury as a result of Defendant Statter's delay. By Plaintiff's own admission, Defendant Statter called Plaintiff on July 27, 2016 to advise her that she would be paid her salary for July 2016, her benefits would be reinstated, and her evaluation summary would be sent to WMC. Compl. ¶ 110. Plaintiff went on to successfully complete her WMC fellowship without consequence. *Id*. ¶ 130. Accordingly, Plaintiff has failed to plausibly allege a Section 1981 claim based on Defendant Statter's delay in sending her summary evaluation.

### V.    Plaintiff's Retaliation Claims are Dismissed

Plaintiff asserts that she "was subjected to retaliation for complaining about what she believed to be discriminatory terms and conditions of employment based on pregnancy, race, national origin and/or disability and/or for taking action to remedy what she believed to be same

19

by appealing the discriminatory decision of Dr. Statter (in 2015 based on race) and in 2016 based on race, national origin, sex, pregnancy, and pregnancy related disability." Compl. ¶ 153. She further contends that she was "subjected to retaliation for complaining about what she believed to be discriminatory terms and conditions of employment based on her race when Defendant Statter refused and/or delayed to send her evaluation to Westchester Medical Center in July 2016." *Id.* ¶ 154. For the reasons that follow, Plaintiffs' retaliation claims are dismissed.

To establish a retaliation claim, Plaintiff must plausibly allege that: "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (evaluating Section 504 claim); *see also Papelino*, 633 F.3d at 91 (same for Title IX); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (same for Section 1981); *McKie v. New York Univ.*, No. 94 CIV. 8610 (LMM), 2000 WL 1521200, at *3 (S.D.N.Y. Oct. 13, 2000) (same for Title VI).

Here, Plaintiff fails to plausibly allege the first element of her *prima facie* case—that she engaged in any protected activity. Plaintiff's Complaint is devoid of any allegation that she ever filed a complaint—or otherwise informally raised concerns—regarding her purported belief that Defendants were discriminating against her. The closest Plaintiff comes to suggesting she made any such complaint is her allegation that she emailed Defendant Statter on July 27, 2016 asserting that Defendant Statter's insistence that Plaintiff "give up her right to appeal and . . . resign from the program as a condition for providing her with the summaries amounted to blackmail." Compl. ¶ 108. Plaintiff does not allege, however, that she wrote in the email that

20

she believed Defendant Statter was "blackmailing" her or otherwise mistreating her due to her race, national origin, sex, pregnancy status, or disability.  The Second Circuit has held that a plaintiff did "not engaged in protected activity" when he sent a letter to his supervisor requesting additional training and reassignment "without ever mentioning, or even alluding to, [the plaintiff's] belief that [his employer's] failure to comply with his requests would constitute unlawful discrimination."  *Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002).  "Because this letter neither pointed out discrimination against particular individuals nor discriminatory practices by the employer, its mailing does not constitute protected activity for the purpose of making a *prima facie* showing of retaliation."  *Id*. (internal quotation marks and citations omitted).  Here, too, Plaintiff's failure to allege that she ever informed Defendants that she believed she was being subjected to discrimination is fatal to her retaliation claim.

## VI.    Plaintiff's Failure to Accommodate Claims are Dismissed

Plaintiff contends that Defendants failed to reasonably accommodate Plaintiff in violation of Title IX and Section 504 by "denying her another opportunity to take the [ABSITE] test." Compl. ¶ 187.  For the reasons that follow, the Court dismisses these claims.

Defendants argue that Plaintiff fails to state a failure to accommodate claim because she asked Defendants to make a "substantial modification" to their program rather than grant a reasonable accommodation.  The Court agrees.  "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person."  *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 413, 99 S. Ct. 2361, 2370–71, 60 L. Ed. 2d 980 (1979).  Here, after failing to meet Montefiore's requirement that she receive over 30 percent on the January 27, 2017 ABSITE exam in order to regain admission as of July 2017, Plaintiff asked for "another opportunity" to take the test.  Compl. ¶

21

131.  As the ABSITE exam is only offered once annually, *see supra* note 1, Plaintiff would have been in PGY5 for six months without having scored above 30 percent on the exam.  Defendants' decision not to grant Plaintiff yet another opportunity to take the ABSITE test a year later was particularly reasonable in light of the fact that Plaintiff had also scored below 30 percent on her 2015 and 2016 ABSITE exams.  Compl. ¶¶ 38, 43, 81, 85.  In other words, the January 2017 ABSITE exam was the third exam on which Plaintiff had scored below 30 percent, and Defendants reasonably opted not to give her a fourth opportunity.  Accordingly, "it is clear that [Montefiore's] unwillingness to make major adjustments in its [residency] program does not constitute such discrimination."

Defendants also argue that Plaintiff's Title IX failure to accommodate claim must be dismissed because she directly attributes her request for an accommodation to her thyroid problem, not her sex or pregnancy.  Indeed, Plaintiff alleges that she "was unable to score up to the 30th percentile in ABSITE but had asked for another opportunity and an accommodation *in light of her medical situation* but Defendants have failed to give [the] same to Plaintiff."  Compl. ¶ 131 (emphasis added).  Plaintiff never alleges in her Complaint that her thyroid problem was related to her pregnancy, or that she experienced any other pregnancy-related complications during her 2016 pregnancy.  She states only that she was "diagnosed with a thyroid problem" in November 2016, the "same month she gave birth to her daughter."  *Id*. ¶ 128.  Yet even assuming that Plaintiff's thyroid problem was, in fact, a pregnancy-related condition, her Title IX failure to accommodate claim would fail for the same reason her Section 504 claim fails.

In light of the Court's holding that Plaintiff's failure to accommodate claims fail because she asked for a "substantial modification" to Defendants' program, it need not reach Defendants' argument, made in the alternative, that the claims also fail because Plaintiff has failed to

22

plausibly allege that she is otherwise qualified for the Residency Program.

**VII.    Plaintiff's Hostile Work Environment Claim is Dismissed**

Plaintiff claims that Defendants subjected her to a hostile work environment in violation of Section 1981, Title VI, Title IX, or Section 504.  A hostile work environment claim requires a court to "analy[ze] a workplace environment as a whole to discover whether it is 'abusive.'" *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) (quoting *Harris v. Forklift*, 510 U.S. 17, 22, (1993)).  Each of Plaintiff's hostile environment claims are governed by the same general standards.  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) ("A Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment."); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) ("While it is obviously a matter of degree, to demonstrate a hostile work environment more than an episodic pattern of racial antipathy must be proven to obtain statutory relief. A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive."); *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 299 (S.D.N.Y. 2014) (holding that a plaintiff bringing a Section 504 hostile work environment claim must allege she suffered conduct that "(1) is objectively severe or pervasive; (2) creates an environment that the plaintiff . . . subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [disability].").  Isolated incidents or "episodic" stray remarks are not "sufficiently continuous and concerted in order to be deemed pervasive."  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citation and quotation mark omitted).

23

Plaintiff has failed to plausibly allege facts giving rise to a hostile work environment claim under any of these statutes.  Indeed, she has not alleged that Defendants made a single disparaging or derogatory comment with respect to her race, sex, pregnancy or disability, or otherwise engaged in severe or pervasive conduct of a discriminatory nature.  She has further failed to plausibly allege that the Residency Program was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [her] educational environment."  *Papelino*, 633 F.3d at 89.  The Court thus dismisses Plaintiff's hostile work environment claims.

## VIII.    NYSHRL, NYCHRL, and State Common Law Claims

Because the Court dismisses Plaintiff's federal claims, it declines to exercise supplemental jurisdiction over the NYSHRL, NYCHRL, and state common law claims.  Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  But a district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction."  *Id.* § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine–judicial economy, convenience, fairness, and comity–will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (internal quotation marks omitted).

Here, because the Court dismisses the federal claims early in this litigation, declining jurisdiction over the state tort claims would not disserve the principles of judicial economy, convenience, or fairness, or comity.  *Id.*  Accordingly, Plaintiff's state and municipal claims are

24

dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss.  Although the Court is sympathetic to Plaintiff's desire to complete her surgical residency, she has not established that she was subject to a hostile work environment or that her termination from Montefiore was the result of unlawful discrimination, retaliation, or failure to accommodate.  To the extent that Plaintiff has a good faith basis to amend her Complaint, she may do so no later than October 30, 2020.  The Clerk of Court is thus respectfully directed to terminate the motion at Docket Entry 24.

SO ORDERED.

Dated:    September 30, 2020
          New York, New York

Ronnie Abrams
United States District Judge